**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| STEVEN LAWTON, *Plaintiff* | § | |
| v. | § | |
| | § | Case Number: 1:26-cv-2078 |
| APEX TRADER FUNDING INC., | § | |
| DARRELL MARTIN; and | § | |
| JOHN MARK SKELTON, | § | |
| *Defendants* | § | |

# PLAINTIFF STEVEN LAWTON'S ORIGINAL COMPLAINT

Plaintiff Steven Lawton, by and through his undersigned counsel, hereby files this Original Complaint against Defendants Apex Trader Funding Inc., its Chief Executive Officer, Darrell Martin, and John Mark Skelton, and alleges as follows:

## I. INTRODUCTION

1. This is a civil action arising under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1-26, and CFTC regulations promulgated under 17 C.F.R. pts. 1-190, and under Texas statutory and common law, seeking damages and equitable relief against Defendant Apex Trader Funding, Inc. ("Apex") and the named individual Defendants for the operation of aan unregistered commodity pool; for fraud and manipulation in connection with commodity-interest

transactions; and for violations of the Texas Deceptive Trade Practices-and Consumer Protection Act, fraudulent inducement, unjust enrichment, and breach of fiduciary duty.

2. Apex, based in Austin, Texas, represents itself to the public as a proprietary "prop" trading firm that offers users access to "funded" trading accounts in exchange for subscription fees. Apex has each prospective trader pay an "evaluation" fee for the opportunity to prove his trading skills. If the trader fails the evaluation, the account is closed and Apex keeps the fee. If a prospective trader passes the evaluation, he may purchase a "performance" account. If he performs well enough in his simulated trades to meet the company's benchmarks, he is promised a percentage of the theoretical profits that he would have generated if the trade was actual instead of simulated (i.e., a "payout" in real money). Apex makes money not by directly investing its own funds in the futures markets, but primarily by retaining the fees of traders who fail challenges.

3. As alleged herein, Apex actually operates a commodity pool. It solicits, accepts, and pools millions of dollars in fees and contributions from tens of thousands of traders. Its "proprietary" funding is sourced from those pooled fees. Trades are aggregated through a master-trading-account structure expressly contemplated by Apex's own form agreement, and traders are compensated as a

proportionate allocation of "trading profits." That structure is a hallmark of a pooled investment vehicle, and operation of such a vehicle without CFTC registration as a Commodity Pool Operator ("CPO") violates 7 U.S.C. § 6m(1).

4. Apex's marketing model is built on representations that are at best materially misleading and at worst materially false. Apex publicly advertises "no hidden rules," "no catch," "5 trading days. No denied payouts," "simple rules," "zero personal financial risk," and "some of the highest profit payouts in the industry." These representations were made to Plaintiff Lawton and to thousands of other traders to induce the continued payment of subscription fees. They were untrue when made and remain untrue today.

5. Plaintiff's experience, documented herein, is the rule, not the exception. Plaintiff Steven Lawton ("Plaintiff" or "Mr. Lawton") did a great deal of business with Apex between about September 27, 2021 and July 24, 2024. During that time, he made 8,099 separate purchases from Apex, comprised of 6,968 evaluation accounts (5,187 purchased outright and 1,781 obtained by reset), 1,128 performance account activations, and 3 market data add-ons. Apex encouraged prospective traders to believe they would receive payouts if they met certain benchmarks in their performance accounts. But these benchmarks were intended to deceive the traders as the benchmarks were actually nearly impossible to meet.

Through his interactions with Apex, Plaintiff sustained documented actual losses in the amount of $404,941, and he never received <u>any</u> actual payouts from the company from this trading activity.

## II. <u>PARTIES</u>

6. **Plaintiff Steven Lawton**. Plaintiff Steven Lawton is an individual who resides in the State of Georgia. He may be served with process through undersigned counsel.

7. **Apex Trader Funding, Inc**. Defendant Apex Trader Funding Inc. is a domestic for-profit corporation organized and operating under the laws of the State of Texas, with its main business office at 2028 E. Ben White Boulevard, Suite 240-9873, Austin, Texas, 78741. Its registered agent for service of process is United States Corporation Agents, Inc., 10601 Clarence Drive, Suite 250, Frisco, Texas, 75033.

8. **Darrell Roland Martin**, an individual, is the co-founder and chief executive officer ("CEO") of Apex Trader Funding Inc. Mr. Martin resides in Decatur, Texas. He can be served with process at his place of residence, 498 Private Road 2391, Decatur, Texas, 76234, or wherever he may lawfully be found.

9. **John Mark Skelton**, an individual, is a co-founder and Chief Operating Officer ("COO") of Apex. He resides in San Antonio, Texas. He can be served with process at 13 Byron Nelson, San Antonio, Texas, 78257, or wherever he may lawfully be found.

## III. JURISDICTION AND VENUE

10. This action arises under the Constitution and the laws of the United States. Jurisdiction is conferred by 28 U.S.C. §1332(a)(1) because the amount in controversy is over US$ 75,000 as set forth herein and there is complete diversity of citizenship between the parties.

11. This Court has specific personal jurisdiction over Defendants because Defendants have sufficient minimum contacts with Texas, have purposely availed themselves of the benefits and protections of Texas law, and do a substantial amount of business in Texas such that the Court's exercise of personal jurisdiction accords with due process.

12. Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in this District and because Defendants are subject to the Court's personal jurisdiction with respect to this action.

13. Venue is proper in this District because it is where Defendants Darrell Martin and John Mark Skelton reside and is where Apex's principal place of business is located.

## IV. STATEMENT OF FACTS

### A. *The Apex Business Model*

14. Apex represents itself to the public as a "proprietary trading" firm. Apex markets multi-tier subscription products to retail traders, who pay recurring monthly fees, plus evaluation, activation, platform, data, and exchange fees, for the opportunity to participate in two-phase "evaluation" and "performance account" programs. Neither type of account includes direct futures trading. Rather, they both involve trading simulations. But Apex markets these programs to traders as providing access to futures-contract trading on regulated exchanges, including the Chicago Mercantile Exchange ("CME"), the Chicago Board of Trade ("CBOT"), the Commodity Exchange ("COMEX"), the New York Mercantile Exchange ("NYMEX"). The evaluation phase is acknowledged by Apex's own trader Agreement to be a "SIM" (simulated) environment, and the actual venue of execution, internalization, or counterparty-routing of trader orders in either the evaluation or performance account phase is not publicly disclosed by Apex. Whether and to what extent trader positions marketed as exchange-traded futures

are in fact executed on those exchanges, internalized on Apex's book, or routed against a swap counterparty is a question central to Plaintiff Lawton's Commodity Exchange Act claims and one on which discovery will clarify.

15. Apex's form Performance Account Agreement (the "Agreement"), which every trader is required to execute as a condition of participation, expressly authorizes Apex to "set up a copy trade account to copy trader's trades from SIM account at any ratio with or without notice in a Live Account held by the Company." What that language means, in operation, is that multiple traders' positions are aggregated, mirrored, copied, and netted through a single master trading account that Apex itself controls and from which Apex extracts the economic spread between trader-reported "profits" and the actual cleared-trade results.

16. Apex solicits, accepts, and receives substantial funds from traders in multiple forms, including: (a) monthly subscription fees; (b) evaluation fees; (c) activation fees; (d) platform fees; (e) data fees; (f) exchange fees; and (g) a percentage share of profits beyond a threshold. These funds flow into a pooled commercial structure. Trader compensation is calculated as a proportionate allocation of "Trading Profits" as defined in the Agreement—the hallmark of a pooled investment vehicle.

17. Apex publicly represents on its website the "Total Compensation to Customers Since 2022" as a specifically advertised metric. That representation is itself a public admission that Apex has been operating, soliciting trader funds, and paying out trader compensation as a commercial pool operator continuously since 2022, through which period Apex was not—and is not—registered with the CFTC as a Commodity Pool Operator.

***B. Apex's Public Marketing Representations***

18. Apex's current public marketing campaign—directed at both retail traders and "get rich quick" schemers – consists of categorical representations about its business practices that were and remain untrue.[1] The Apex homepage, at apextraderfunding.com (screenshots of which Plaintiff has preserved and dated) prominently features respresentations including the following:

19. Under a banner labeled "The Apex Difference," Apex represents "NO Payout Denials."

20. In a box labeled "Rules," Apex represents "Simple Rules. No Gray Area. No Interpretation of rules. Nothing Vague. Nothing Obscure. No arbitrary rules. No Gimmicks. No Hidden Rules."

[1] Interestingly, Apex advertises it has introduced a "new" account scheme as of March 1, 2026. It now refers to the types of accounts available while Mr. Lawton was actively trading as "legacy" accounts. As of the date of this filing, Apex is still (at least temporarily) offering legacy accounts, and still posts the rules applicable to legacy accounts.

21. In a box labeled "Payouts," Apex represents "5 Trading Days. No denied payouts. … Payout confidence. No surprises. No special treatment. Everyone under the same rule set."

22. Apex represents that the "Consistency Rule" applicable to trader accounts permits up to 50 percent of single-day profits to be attributed toward a payout, with no day's profits exceeding 50 percent of the total profit balance. Apex represents that there are "NO Eval consistency rules," promising the absence of the very arbitrary obstacles to payout that Apex in fact deploys.

23. These representations are the express inducement that brings retail traders, including Plaintiff Lawton, to pay subscripton fees in the expectation of a fair, rule-based, non-discretionary process. They are also material to the Defendants' schemes, because each of Apex's officers know these representations to be untrue at the time they are made. As further discussed below, the statements of Apex's own co-founder and COO confirms that Apex has, by design, taken affirmative measures to attack the large number of payouts it has had to make to users.

24. Apex's recent 2026 marketing campaign, in which it advertises "no more payout denials," is an implicit admission that payout denials were a defining feature of its prior (i.e. legacy) business model. The fact that not denying payouts

is now a prominent Apex marketing strategy speaks volumes about the historical and continuing nature of the enterprise.

### *C. Corporate Opaqueness*

25. Apex maintains affirmative corporate opacity that supports the inference of intentional regulatory evasion. Apex's public-facing address is a UPS Store mailbox at 2028 E. Ben White Blvd., Ste. 240-9873, Austin, Texas, 78741 – a private commercial mail-receiving agency, not a corporate headquarters. Apex published no officer registry beyond first-name customer service representatives and a "Risk Department" that communicates from generic addresses. Apex appears in no NFA Background Affiliation Status Information Center ("BASIC") registration record in any capacity, despite operating, soliciting funds from, and paying compensation to tens of thousands of traders since at least 2022. This pattern of opacity is itself supportive of Plaintiff Lawton's CEA, fraud, and DTPA allegations.

### *D. Plaintiff's Trading History with Apex (2021-2024)*

26. During the time Plaintiff Lawton was involved with Apex, participants started with evaluation accounts. The company allowed participants to maintain an unlimited number of evaluation accounts at any given time. The price of each evaluation account varied, as Apex almost always offers discounts.

During the period in which Plaintiff Lawton was a client of Apex, he paid a range of US$ 16.70 to US$ 160.75 per individual evaluation account.[2] There were no payouts on evaluation accounts, which were allegedly intended to assess the trading prowess of the participant.

27. Evaluation accounts operated with a trailing drawdown mechanism which follows the account's high point watermarked and never stops following the account's balance. The amount of drawdown permitted and profit target varies per the size of the account. Using the ¤$ 50,000 account as an example, Apex required that a participant's simulated trades earn ¤$ 3,000 before losing the trailing "drawdown" amount of ¤$ 2,500. Once a participant lost ¤$ 2,500 in simulated trades, he failed the evaluation, that account was closed, and Apex kept the trader's fee that the client paid for the evaluation account.

28. After each successfully "passed" Evaluation Account, a participant had seven days in which to purchase a Performance Account. Participants were allowed to maintain up to 20 performance accounts at a given time.

[2] To distinguish between real and simulated currency, "US$" is used to denote U.S. Dollars and "¤$" is used to denote simulated funds.

29. The Performance Account activation charge was a separate charge from the Evaluation Account fee. A participant could pay monthly, for each thirty days the account remained active, or pay a one-time "lifetime" fee covering the account for as long as it stayed live. Prices varied over time, by account size, and by trading platform. Market data was not part of this charge.

30. During the period in which Plaintiff Lawton was a client of Apex, he paid a range of US$ 85.00 to US$ 173.20 per individual Performance Account.

31. Under the Rithmic Performance Account Agreements, Apex paid the Rithmic market data fees, and a participant paid only for data beyond what Apex provided. Plaintiff purchased three such optional depth-of-market add-ons across the entire period, totaling US$ 54.14.

32. Performance accounts offered payouts if participants reached the requisite earnings before reaching the drawdown amount; i.e. “blew up” and lost the account.

33. In a ¤$ 50,000 performance account, a trader would have the theoretical ¤$ 50,000 at the start of the ten trading-day period. If the trader lost more than ¤$ 2,500 theoretical dollars at any time prior to achieving more than ¤$ 2600 profit (and afterwards, after losing any of those simulated profits down to ¤$ 50,100), then the performance account would be “blown.” Further, whenever

there were theoretical gains of 30% of overall profits on the account or more during those ten trading days, this would increase the threshold needed for the rest of the days to bring the individual most profitable day below that amount.

34. In the event that a performance account owner managed to keep an account through the 10-trading-day period, the account could win an actual payout of up to US$ 2,000 per ¤$ 50,000 performance account during designated request periods and take all of the simulated profits after receiving payouts across a number of request windows.

35. Plaintiff failed thousands of evaluations. But when he had the opportunity to do so, he purchased performance accounts. He typically purchased 20 evaluation accounts at a time, in case he was able to get them to the profit target to then purchase 20 performance accounts, the maximum number allowed. Over time, Plaintiff Lawton purchased and "blew up" accounts at a much greater rate than the average Apex user.

36. Between about September 27, 2021 and July 24, 2024, Plaintiff made 8,099 separate purchases from Apex, comprised of 6,968 evaluation accounts (5,187 purchased outright and 1,781 obtained by reset), 1,128 performance account activations, and 3 market data add-ons. And yet he never received a payout.

37. Mr. Lawton, who suffers from a gambling addiction, sent three separate written messages to Apex's help desk, requesting that the company put limits on his ability to access new accounts. On all three occasions Mr. Lawton was refused. And still Apex continued to target Mr. Lawton with marketing.

38. Through his transactions with Apex, Plaintiff sustained documented losses in the amount of US$ 404,941 without receiving any payouts from the company.

### *E. The Skelton Recording*

39. Apex's pretextual payout-denial scheme was described by Apex's own co-founder and COO, John Mark Skelton ("Mr. Skelton" or "Defendant Skelton") in a recorded Zoom video conference (the "Skelton recording"). In that video, Mr. Skelton described measures and rule changes that Apex planned to – and ultimately did – institute in order to stem their large numbers of payouts to users.

40. On or after January 30, 2025, Plaintiff saw this video recording[3] of Mr. Skelton, in which the COO explains that when an Apex participant completes day 8 of the 10 days required to be eligible for a payout, he sabotages them by making

---

[3] This video can be found online at https://www.reddit.com/r/Daytrading/comments/1i0makd/the_co_founder_of_apex_trading_explaining_their/

sure "that these people are following some good rules…." These participants are then sent "a particular [email] message that's 1 of 50 I have laid out…" that lets the customer know their trades will be monitored over the next few days. Then, when those customers make more trades that would be required as part of that monitoring, their risk of losing the account rises dramatically, especially near the end of the 10 trading days when traders have to meet the minimum required earnings to receive a payout.

41. Meanwhile, Apex's profits were strong. On information and belief, Apex's reported net profit was US$ 13,116,555 for July 12-31, 2024; US$ 17,093,970 for August 2024; US$ 9,221,778 for September 2024; and US$ 15,718,500 for October 1-28, 2024.[4]

## V. CAUSES OF ACTION

### Count 1 – OPERATION OF AN UNREGISTERED COMMODITY POOL

42. Plaintiff Lawton re-alleges and incorporates by reference the paragraphs in Part IV above as if repeated fully here.

43. The Commodity Exchange Act requires any person operating a commodity pool to register as a Commodity Pool Operator with the CFTC and become a member of

[4] https://storage.courtlistener.com/recap/gov.uscourts.txwd.1172817645.1.0.pdf; see also the video referenced in footnote 1.

the NFA. U.S.C. § 6m(1). A "commodity pool" is "any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests." 17 C.F.R. § )10(d)(1). A "commodity pool operator" is any person engaged in such an enterprise who "solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests." 7 U.S.C. § 1a(11).

44. Apex's own Agreement and business structure establish that Apex operates a commodity pool in that (1) the Agreement provides that Apex "may set up a copy trade account to copy trader's trades from SIM account at any ratio with or without notice in a Live Account held by the Company," such that multiple traders' accounts feed into a master trading account controlled by Apex; (2) Apex solicits and receives funds from traders in the form of subscription fees, commissions, exchange fees, data fees, and a percentage share of trading profits; (3) these funds flow into a pooled structure in connection with which Apex markets, advertises, and represents futures-contract trading on regulated exchanges (CME, CBOT, COMEX, NYMEX), with the actual venue of execution to be determined through discovery; and (4) traders' compensation is calculated as a proportionate allocation of "Trading Profits"—the hallmark of a pooled investment structure.

45. Apex is not registered with the CFTC or NFA as a Commodity Pool Operator. A search of the NFA's Background Affiliation Status Information Center ("BASIC") database returns no current or historical registration for Apex Trader Funding, Inc., Apex Investing Institute, Darrell Roland Martin, or John Mark Skelton. Apex's assertion that it is engaged in "proprietary trading" for its own account and risk is a legal fiction. Apex does not fund its trading from its own capital alone; it solicits funds from thousands of traders through subscription fees and profit-sharing, combines those funds, and allocates profits and losses to individual trader sub-accounts. This is precisely the the type of activity the CPO registration requirement is designed to regulate.

46. The failure to register as a CPO is not a mere technical violation. CPO registration imposes critical protections for pool participants, including mandatory disclosure documents, periodic reporting to the NFA, segregation of pool-participant funds, restrictions on commingling, and fiduciary obligations to pool participants. Apex's failure to register enables it to operate without these protections—withholding account statements, modifying rules unilaterally, and seizing trader capital—exactly the abuses that CPO registration is designed to prevent. *See See CFTC v. Equity Financial Group, LLC,* No. 1:04-cv-01512-RBK-AMD (D.N.J. Feb. 4, 2008) (Kugler, J.) (finding defendants operated unregistered commodity pools and aided and abetted CPO violations).

47. The individual Defendants (Martin and Skelton), as controlling persons within the meaning of 7 U.S.C. § 13C(b), are jointly and severally liable for Apex's operation of an unregistered commodity pool. Each Defendant personally directed, authorized, participated in, or knowingly permitted the conduct underlying the violation, including the marketing and solicitation of funds, the design and maintenance of the master trading account structure, and the failure to register.

**Count 2—FRAUD AND MANIPULATION UNDER THE CEA (7 U.S.C. § 9(1); 17 C.F.R. § 180.1)**

48. Plaintiff Lawton re-alleges and incorporates by reference the paragraphs in Part IV above as if repeated fully here.

49. The CEA's anti-fraud provisions prohibit any person from employing any manipulative or deceptive device or contrivance in connection with any swap, contract of sale of any commodity in interstate commerce, or contract for future delivery. 7 U.S.C. § 9(1); 17 C.F.R. § 180.1.

50. Apex's conduct constitutes fraud and manipulation in multiple respects. First, Apex markets funded trading accounts while systematically altering rules to prevent payouts—a classic scheme to defraud. Second, Apex's Agreement authorizes it to "revise policies and terms . . . at any time without notice," enabling it to change the rules after traders have invested time and

money. Third, Apex's own co-founder and Chief Operating Officer, John Mark Skelton, described on video the company's strategy for finding pretextual justifications to deny payouts to profitable traders—direct evidence of fraudulent intent. Fourth, Apex's deliberate withholding of comprehensive account statements prevents traders from detecting and documenting the fraud. Fifth, Apex's confidentiality clause operates to suppress reporting of the scheme.

51. The individual Defendants (Martin and Skelton), as controlling persons within the meaning of 7 U.S.C. § 13c(b), are jointly and severally liable for Apex’s violations of the CEA’s anti-fraud provisions.

**Count 3– FRAUDULENT INDUCEMENT**

52. Plaintiff Lawton re-alleges and incorporates by reference the paragraphs in Part IV above as if repeated fully here.

53. To prevail on a fraudulent inducement claim under Texas law, a plaintiff must show that the defendant: (1) made a material representation, (2) that was false, (3) knowing that the statement was false when made, (4) with intent that the plaintiff rely on the false statement, and the plaintiff actually relied on the representation; and (5) the plaintiff was damaged as a result of his reasonable reliance on the false statement. *Interval Int'l, Inc. v. Trinity Millennium Grp., Inc.*, No. 3:15-CV-815-P, 2016 U.S. Dist. LEXIS 184417 *9 (N.D. Tex. 2016).

54. Defendants Apex, Martin, and Skelton made material representations that were false. Apex claimed to share the losses of users, but that is not the case. Apex only loses money if the users make money. Apex makes its money not from direct trading of futures, but exclusively from user account fees it keeps when users fail. Thus, it is not in Apex's best interest to provide a lot of payouts.

55. Apex publicized that it did not want gamblers using its service. But when Plaintiff disclosed that he believed he had a gambling addiction and asked Apex to limit his access, Apex refused and continued to target him with marketing materials.

56. Apex intended that its users rely on its material misrepresentations so that they would continue to purchase accounts that would not pay out, allowing Apex to profit.

57. As a direct and proximate result of the knowing misrepresentations of Defendants, Plaintiff continued to purchase accounts and consequently suffered financial losses in the amount of US$ 404,941.

58. Plaintiff therefore prays for relief as set forth below.

**<u>Count 4– VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT</u> (*TEX. BUS. & COM. CODE §17.46 ET SEQ.*)**

59. Plaintiff Lawton incorporates by reference the paragraphs in Part IV above as if repeated fully here.

60. Defendants engaged in an unconscionable action or course of action that, to Plaintiff's detriment, took advantage of his lack of knowledge, ability, experience, or capacity to a grossly unfair degree. Specifically, Defendants lured Mr. Lawton into what they knew and intended to be an unfavorable business arrangement by taking unfair advantage of the fact that Defendants have far more knowledge about trading than Mr. Lawton does.

61. Defendants fraudulently employed a "bait and switch" system, falsely representing that users of Apex would receive payouts on performance accounts when they met certain criteria and then purposely changing the parameters before users were able to collect.

62. Plaintiff Lawton has suffered economic damages from Defendants' deceptive and fraudulent behavior, and he is entitled to treble damages and attorney fees and costs under TEX. BUS. & COM. CODE §17.50.

**Count 5—BREACH OF FIDUCIARY DUTY**

63. Plaintiff Lawton incorporates by reference the paragraphs in Part IV above as if repeated fully here.

64. Under Texas law, a plaintiff suing for breach of fiduciary duty must prove "[1] the plaintiff and defendant had a fiduciary relationship, [2] the defendant breached it fiduciary duty to the plaintiff, and [3] the breach resulted in injury to the plaintiff or benefit to the defendant." *Dalf Energy, Ltd. Liab. Co. v. GS Oilfield Servs., Ltd. Liab. Co. (In re Dalf Energy, Ltd. Liab. Co.)*, No. 24-50032, 2024 U.S. App. LEXIS 32868 *6 (5th Cir. 2024), quoting *Wolf v. Ramirez*, 622 S.W.3d 126, 142 (Tex. App.—El Paso 2020, no pet.).

65. "Generally fiduciaries owe the following duties to their principals: the duty of loyalty and utmost good faith; duty of candor; duty to refrain from self-dealing; duty to act with integrity; duty of fair, honest dealing; and the duty of full disclosure." *Id.*

66. By operating an unregistered commodity pool, by pooling trader funds in a master account structure, by exercising discretion over the disposition of those funds, and by undertaking the obligations of an entity that solicits funds from the public for purposes of commodity-interest trading, Defendants acted as fiduciaries with respect to Plaintiff Lawton and similarly situated traders.

67. Defendants breached their fiduciary duties by, among other things, withholding earned profits on pretextual grounds, failing to provide comprehensive account statements, concealing material facts about the company's operations, suppressing reporting of payout denials through confidentiality clauses, and operating without the disclosures and protections that CPO registration would have required.

**Count 6– UNJUST ENRICHMENT**

68. Plaintiff Lawton incorporates by reference the paragraphs in Part IV above as if repeated fully here.

69. Plaintiff acknowledges that unjust enrichment is not a distinct independent cause of action, but rather a theory of recovery. *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi 2002, pet. denied). A party may recover under an unjust enrichment theory where a person has obtained a benefit from another due to fraud, duress, or taking of undue advantage. *Id*.

70. If Plaintiff does not prevail in his claims for legal remedies for fraudulent inducement and for violation of the DTPA, he will lack a suitable remedy at law.

71. Defendants profited from their own fraudulent behavior and took unfair advantage of Plaintiff. Thus, Plaintiff seeks damages in unjust enrichment as an alternative remedy.

**Count 7—CONTRACTS HAVE ILLUSORY PROMISES**

72. Plaintiff Lawton incorporates by reference the paragraphs in Part IV above as if repeated fully here.

73. In an alternative claim, the Plaintiff alleges that the contracts are illusory as they do not bind Defendant Apex.

74. For instance, the contracts state that Apex can, "at its own discretion" select either a "synthetic or live currency." Further, "[s]ynthetic accounts do not contain genuine or legal tender, but shall still be available for payout as defined in this agreement. Company may set up a copy trade account to copy trader's trades at any ratio with or without notice and/or a direct account on behalf of the trader, at its sole discretion." The difference between a synthetic or live currency is the difference between a mere educational tool and a commodity requiring registration and non-wavable protections.

75. There is a similar problem with the unilateral ability to, without notice, change the terms and conditions of the contracts.

76. There is a great deal of case law which creates requirements for an arbitration provision to be enforceable. Here, however, putting such a provision in the unilaterally and without notice sole ability of Apex to change the contract, makes any arbitration provision an illusory promise.

77. Thus, the contracts are essentially illusory as they can be unilaterally, completed changed in nature by Apex. Thus, the contracts do not have sufficient consideration to be binding contracts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lawton prays for judgment as follows:

a. Actual and economic damages, including liquidated and unliquidated damages;

b. Exemplary damages, where appropriate;

c. Treble damages, where appropriate;

d. Pre-judgment and post-judgment interest at the maximum rate allowed by applicable law from the date of judgment until paid in full;

e. Court costs;

f. Attorney fees; and

g. All other relief, special or general, legal or equitable, as Plaintiff may be shown to be justly entitled to receive.

Respectfully submitted on this 24th day of July, 2026.

/s/ Rain Levy Minns Udall

Rain Levy Minns Udall
State Bar No. 24034581
Minns Law Firm, P.C.
d/b/a Rain Minns Law Firm
4412 Spicewood Springs Rd., Suite 500
Austin, Texas 78759-8583
Tel.: 512-372-3222
Fax: 512-861-2403
rain@rainminnslaw.com

*Attorney in charge for*
*Plaintiff Steven Lawton*